Plaintiffs, Charles Pritchard, Alton Foster, Donald Johnson, and Kathy Johnson ("investors"), purchased condominium units (prior to the construction of those units) in a project known as East Pass Towers located in Destin, Florida. They sued N 
C Properties, Chancellor Land Co., Inc., and Neda, Inc. ("developers"), under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701-1720 ("ILSFDA" or "the Act"), for failure to provide a written prospectus covering the development. The amended complaint was filed on September 25, 1985, and plaintiffs filed a motion for summary judgment on October 9. A hearing on the motion was set for November 1, but it was stayed pending a decision from the United States Court of Appeals for the Eleventh Circuit regarding whether the ILSFDA applied to condominium sales.
On November 6, 1985, the defendants filed a motion for partial summary judgment, contending that the ILSFDA did not apply to condominium sales. The hearing *Page 1347 
on the cross-motions was held March 20, 1986, and the court rendered its order on March 28. At the hearing the circuit court granted plaintiffs' motion for summary judgment and denied defendants' application for leave to file post-hearing affidavits dated March 20. On June 20, 1986, the court rendered its final judgment in favor of the plaintiffs, granting them rescission of the condominium purchase agreements and awarding them attorney fees and the amount paid as earnest money.
In October and November of 1983, each of the investors entered into pre-construction purchase agreements with N C Properties for condominiums in East Pass Towers. The investors deposited letters of credit with N C Properties, Inc., in the amounts of $27,920, $28,200, and $32,200, respectively. These letters of credit were to serve as security on the purchase price and were to be funded at the closing. The letters were ultimately funded by the investors' bank when the circuit court dissolved the temporary restraining order that had enjoined their payment and denied the investors' request for a preliminary injunction.
Although the condominium project was in accord with applicable Florida laws and administrative regulations, it is undisputed that the project did not comply with the disclosure requirements of the ILSFDA. Title 15 U.S.C. § 1703 (1982) states the requirements respecting the sale of lots under the act, as follows:
 "(a) It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails —
 "(1) with respect to the sale or lease of any lot not exempt under section 1702 of this title —
". . .
 "(B) to sell or lease any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee;"
That section essentially requires the developer to furnish a printed prospectus or property report before the purchaser signs the purchase agreement. The Act requires disclosure of the names and addresses of all owners and promoters, the range of selling prices, a description of the land, disclosure of any encumbrances or easements, and other information relevant to the sale. The purpose of the prospectus requirement is to inform the buyer of the details of the offering and prevent fraud in the sale of subdivided real estate.
The developers' initial argument is that the ILSFDA does not apply to condominium sales. The crux of this argument is that a condominium unit is not a "lot" within the meaning of the Act. As can be seen from the quotation above,15 U.S.C. § 1703(a)(1) (1982) makes the act applicable to "the sale or lease of any lot not exempt under section 1702 of this title." (Emphasis added.)
The United States Court of Appeals for the Eleventh Circuit has addressed this very issue:
 "Congress did not draft the statute to apply solely to raw land, but made it applicable to the sale or lease of lots. The legislative history of the Act indicates that Congress was concerned with the sale of fairly large numbers of undeveloped lots pursuant to a common promotional plan. Cong.Rep. No. 1785, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. Ad. News 3053, 3066. The legislative history also employs the terms 'land' and 'real estate.' Id.
Although Congress may have been primarily concerned with the sale of raw land, it struck a balance by making the statute applicable to all lots and providing an exemption, not for all improved land, but for improved land on which a residential, commercial, condominium, or industrial building exists or where the contract of sale obligates the seller to erect such a structure within two years.
 "The key term that we must construe is 'lot' because the sale or lease of any non-exempt lot triggers the provisions of the Act. Lot is not defined anywhere in *Page 1348 
the ILSFDA. The Secretary of Housing and Urban Development (HUD) has defined lot, as part of a rule making proceeding completed in 1973, as 'any portion, piece, division, unit, or undivided interest in land . . . if the interest includes the right to the exclusive use of a specific portion of the land.' 24 C.F.R. § 1710.1
[1987]."
Winter v. Hollingsworth Properties, 777 F.2d 1444
(11th Cir. 1985). (Footnotes omitted.)
That court also explained that the Secretary of Housing and Urban Development ("HUD") intended for the Office of Interstate Land Sales Regulation, the organization designated by the Secretary to administer the ILSFDA, to treat condominiums as the equivalent of subdivisions. The Secretary describes "condominium" as a description of ownership and not a mere structural description. 777 F.2d at 1447, citing 38 Fed.Reg. 23,866 (1973), 44 Fed.Reg. 24,012 (1979). This Court finds this reasoning persuasive, particularly in light of the various forms that condominiums now assume. We also note that § 1702 of the ILSFDA exempts "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." Although the developers do not claim such an exemption, we note in passing that the pre-construction sales contracts did not require construction of the project within two years as required for the statutory exemption. If the Act did not relate to the sale of condominiums, such an exemption would be unnecessary. SeeWinter, 777 F.2d 1444.
The developers contend that, even if the ILSFDA applies, the offering in question was of less than 100 units and was, therefore, exempt under 15 U.S.C. § 1702(b)(1). That section exempts from the registration and disclosure requirements of the Act "the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section." Each of the investors purchased a unit in a development known as East Pass Towers Phase I, a condominium development containing 55 units. The developers contend that this offering was in no way related to East Pass Towers Phase II. They argue that Phase II was never formally offered for sale and that no condominium documents have yet been drafted. It is their contention, as developers of Phase I, that they had a mere option to build Phase II.
The investors, on the other hand, contend that East Pass Towers Phase I and Phase II are part of a common promotional plan and together constitute 101 units, bringing the development within the purview of the Act. A determination of applicability of the Act in the present instance requires a careful reading of the definitions in the Act. Section 1701(3) of the Act defines a "subdivision" as:
 "[A]ny land which is located in any State or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan."
Section 1701(4) defines "common promotional plan" as:
 "[A] plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan." (Emphasis added.)
Section 1701(11) defines "offer" as including "any inducement, solicitation, or attempt to encourage a person to acquire a lot in a subdivision."
The investors' argument below and on appeal is that the developers offered to sell units in Phase I and Phase II as a common plan of development. In support of their argument, they point to the following *Page 1349 
factors: (1) That Neda, Inc., was formed to promote and sell units in both Phase I and Phase II; (2) The project was advertised, represented, and marketed as a two-phase project consisting of two individual towers adjoining each other, Phase I containing 55 units and Phase II containing 46 units; and (3) The project was advertised and intended by the owners to be a two-phase project containing over 100 units. The investors offered the sworn testimony of Arthur Hill, president of Gulf South Corridor Properties, and Winston Biggs, president of Chancellor Land Company, Inc., in support of their claim during the hearing on March 20, 1986. The testimony of both men was that the development was advertised, represented, and marketed as a two-phase project containing two towers. The towers were to be adjacent to one another, sharing a common lobby and beach front. Mr. Biggs testified that the Johnsons were promised the opportunity to trade their Phase I unit for a nicer unit in Phase II when it was completed. He also testified, and it was undisputed by the appellants, that none of the purchasers in this suit was presented with a prospectus prior to the execution of their pre-construction purchase agreements.
A prospectus covering the development was, however, prepared by the developers, and it was admitted into evidence at the March 20 hearing. It was denominated "East Pass Towers Condominium Declaration," with the cover depicting twin towers on the Destin coast. Phase I of the development was to be completed by June 1, 1992. The maximum number of units in the development was to be 101 "if, in the sole discretion of the developer, Phase II is built." The prospectus also said, "The developer has reserved the right to construct additional apartment buildings . . . as part of this condominium at any time prior to June 1, 2002. . . . . The additional units to be constructed will be 46 in number and would be contained in an additional apartment building." Advertising brochures admitted into evidence at the hearing also depicted twin towers joined by a common lobby.
The case of Grove Towers v. Lopez, 467 So.2d 358
(Fla. 3d Dist.Ct.App.), cert. denied, 480 So.2d 1294 (Fla. 1985), discusses the 100-lot exemption from the disclosure requirements of the ILSFDA. In that case, the developer claimed that its "intent" was to construct only 98 units, while the advertising brochures and the prospectus indicated that 108 units would be built. The Florida court held that mere intent to reserve an option to reduce the number of units in order to accommodate market demand was insufficient grounds to claim exemption under the statute. "As long as appellant wanted the option to build 108 units, it was obligated to comply [with the ILSFDA]". 467 So.2d at 361.
This is very similar to what occurred in the present case. Here, the developers contend that they did not offer to sell any units in Phase II and, therefore, that the entire development is exempt from the disclosure requirements of the statute. The statute itself defines "offer" as any
inducement, solicitation, or attempt to encourage a person to acquire a lot. The relevant advertising brochures and sales representations referring to twin towers totaling 101 units are sufficient to constitute offers, inducements, or solicitations for the purposes of the ILSFDA. Such representations necessitated that appellants furnish a prospectus to an investor prior to the execution of any sales agreement.
This Court also agrees with the finding of the circuit court that Phase I and Phase II constitute a "common promotional plan." The statute says that any plan where the land is known, designated, or advertised as a common unit or common name shall be presumed, without regard to the number of lots in a particular offering, to be part of a common promotional plan.15 U.S.C. § 1701(4). The fact that construction on Phase II had not yet begun or that it had not been "formally offered" for sale is irrelevant. The development of Phase II is presumed, under the Act, to be part of a common plan with Phase I. The developers cannot avoid application of the act simply by breaking the development into two smaller segments. SeeEaton v. Dorchester *Page 1350 Development, Inc. 692 F.2d 727 (11th Cir. 1982);Dunaway v. Lewis, 554 P.2d 110 (Okla.Ct.App. 1976).
Appellants next contend that the investors purchased the condominiums with the intent to resell them to developers and that the sales are, therefore, exempt from the disclosure requirements under 15 U.S.C. § 1702(a)(7). We have searched the record below and have found no evidence whatsoever that the investors here intended to resell to developers. The federal regulations applicable to exemption from the ILSFDA provide, "If a developer elects to take advantage of an exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met." 24 C.F.R. § 1710.4(d) (1987). The appellants have offered no evidence in support of their claim and, therefore, we find it without merit.
Finally, appellants argue that the trial court abused its discretion in refusing to consider three affidavits and a deposition filed after the March 20, 1986, hearing on the cross-motions for summary judgment. Their argument is essentially that the trial court granted leave to the investors to file additional affidavits after this date but refused to offer a similar opportunity to the developers.
After reviewing the record, we find that the trial court decided during the March 20 hearing to grant the investors' motion for summary judgment and thereafter granted them leave to file additional affidavits regarding the proper amount of attorney fees to be awarded under 15 U.S.C. § 1709(c). The developers did not offer below, or here, any reason for their delay in filing the affidavits and deposition. Such an offer is required in order to justify a request for a continuance to file additional affidavits under A.R.Civ.P. 56(f). The circuit court was not obligated to grant leave to the developers to file additional affidavits regarding the applicability of the Act. Under these circumstances, we see no abuse of discretion in refusing leave to file additional affidavits or depositions.
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.